IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Christopher Sam Commander, | ) | C/A No. 5:16-03672-TMC-KDW |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Warden Joseph McFadden, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Christopher Sam Commander, ("Petitioner"), a state prisoner, is currently incarcerated in the Lieber Correctional Institution of the South Carolina Department of Corrections ("SCDC") and filed this pro se Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. ECF No. 1. This matter is before the court pursuant to 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(c) (D.S.C.), for a Report and Recommendation ("R&R") on Respondent's Return and Motion for Summary Judgment filed May 19, 2017. ECF Nos. 26, 27. On May 22, 2017, pursuant to *Roseboro v. Garrison*,[1] the court advised Petitioner of the Summary Judgment Motion and directed Petitioner to file a Response to Respondent's Summary Judgment Motion if he wished to pursue his case. ECF No. 28. On June 16, 2017, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgment, ECF No. 42, as well as a Motion to Compel Discovery, ECF No. 43. Respondent filed a Response to Petitioner's Motion to Compel on June 30, 2017. ECF No. 45. Finally, on September 8, 2017, Respondent filed a Supplement to the Appendix in compliance with the undersigned's instruction. *See* ECF Nos. 47, 50. Having carefully considered the parties' submissions and the record in this case, the

_____

[1] 528 F.2d 309 (4th Cir. 1975).

undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 27, be granted, and this habeas Petition be dismissed.

I.      Factual Background

On January 7, 2005, Gervonya Goodwin ("victim") was found dead in her home. App. 173-177; 221; 242.[2] At the time of her death, the victim was pregnant with Petitioner's child, and upon examination of her dead body the fetus was found "expelled" between her legs. App. 209; 237; 303; 346; 532. Before law enforcement arrived at the crime scene, the victim's family, including her daughter, mother, and ex-husband, had a locksmith unlock the victim's door, allowing them entry into the home.  App. 198; 221-223; 242-43. After the family called 911, law enforcement responded to the scene.  App. 201; 287-89. Law enforcement officers described the condition of the victim's body as a "mummified corpse" or "decomposed body" because of the length of time it had been left in the home. App. 175; 289; 346. The victim's car, purse, and cellphone were not found at the crime scene. App. 178; 202; 227; 252; 262; 384. There was no evidence of forced entry in the home, no blood, and no obvious signs of injury or trauma to the victim's body. App. 290; 304; 340-343; 348; 535.

The victim was last seen on the morning of November 29, 2004. App. 238; 250. After November 29, 2004, victim's friends and family tried to call victim, but they never spoke with her. App. 191; 209-213; 239-42; 391. However, they received text messages from her cell-phone number, making them believe victim was alive. App. 211-227; 382. Moreover, victim's daughter received a check from her mother's bank that the daughter thought had been forged because it was not in her mother's handwriting. App. 218-20; 387. Testimony from friends and family

_____

[2] Citations to "App." refer to the Appendix for Petitioner's criminal trial transcript and Post-Conviction Relief ("PCR") Proceedings. That appendix is available at ECF Nos. 26-1 through 26-4 in this habeas matter.

indicated that the victim's nickname was "Vonnie." App. 187; 236; 248; 257. According to family and friends, victim was in a relationship with Petitioner and was trying to end the relationship. App. 237-38; 249.

Based on victim's cell-phone activity and bank transactions that were being made in Florida, law enforcement travelled to the Fort Lauderdale/Miami area. App. 400; 425; 475; 488-89. Law enforcement learned that Petitioner had stayed at a hotel in Miami based on victim's bank records and other information. App. 428. A frequent number on the victim's cell phone was tracked to Sivonnia Hunt. App. 401; 428. Ms. Hunt was tracked to the Tampa area. App. 428. Law enforcement met with Ms. Hunt at her apartment in Tampa, and she told officers she was communicating with "Chris," but she did not know Chris's last name. App. 429-30. Ms. Hunt gave a description of Chris that matched Petitioner. App. 401; 771. When investigators met with Ms. Hunt, they took her statement and showed her a photo line-up, and she identified Petitioner as the man she had met with and spoken to on the victim's phone. App. 430-34; 446-49; 770-71. Ms. Hunt testified that she came into contact with Petitioner through a "chat line" service she saw on television, App. 439, and ultimately, met Petitioner in person at her apartment complex. App. 441-48. Further, Ms. Hunt identified Petitioner in the courtroom. App. 450-51.

Several transactions were made on victim's credit card at hotels in Florida at the beginning of January in 2005. App. 508-510. Then, on January 11, 2005, a transaction was made on victim's credit card at a Holiday Inn in New Orleans, Louisiana. App. 505. Later on January 13, 2005, New Orleans law enforcement officers located victim's car in the parking garage of the New Orleans Holiday Inn. App. 719; 783. Those officers found Petitioner inside a Holiday Inn hotel room that was booked using victim's credit card. App. 648-57; 696-99; 718-23. Specifically, police officers found Petitioner inside the hotel room with a gun pointed to his

head, and he told them: "Get out the room, I'm going to kill myself like I killed Vonnie." App. 656; 678; 699-707; 721. Petitioner dropped the gun, was arrested, and taken into custody. App. 657-65; 700; 722-23. Officers found many of victim's personal possessions inside Petitioner's hotel room including credit cards, bank cards, a banking check book, her driver's license, her social security card, and her birth certificate. App. 669-72; 702-03. Thereafter Petitioner was charged with the murder of Gervonya Goodwin. App. 1058-59.

II.    Procedural Background

In 2005, Petitioner was indicted during the April term of the Richland County Grand Jury for murder (2005-GS-40-03186). App. 1058-59. Petitioner proceeded to a jury trial on October 10, 2006, before the Honorable James W. Johnson, Circuit Court Judge. App. 1. Petitioner was represented by Public Defenders Douglas S. Strickler and Lauren H. Mobley.[3] *Id.* Assistant Solicitors John P. Meadors and K. Luck Campbell represented the State. *Id.* After a trial that ended on October 16, 2016, the jury found Petitioner guilty of murder. App. 917-20. Judge Johnson sentenced Petitioner to life without the possibility of parole. App. 927-28.

Robert M. Dudek, III, Deputy Chief Appellate Defender, represented Petitioner in the appeal of his conviction and sentence. ECF No. 26-5. In his final appellate brief, Petitioner raised the following two issues:

1.

Whether the court erred by ruling pathologist Dr. Clay Nichols could testify that from the circumstances which followed the decedent's death, such as her automobile and other property being taken by her boyfriend, appellant, for his own use, and the apparent "cover-up" that he opined her death was a homicide, and also was not an accident, since Dr. Nichols opinion in this regard was not admissible under Rule 702, SCRE because this opinion was not based on scientific, technical or other specialized knowledge that was beyond a judgment

---

[3] Initially, Petitioner was represented by Jeanette VanGinhoven until Douglas Strickler took over the defense of his case because Ms. VanGinhoven had a conflict. App. 975; 988-89.

the jury could make on its own?

2.

Whether the court erred by refusing to charge the defense of accident where jailhouse snitch and "jailhouse lawyer" John Pressley testified appellant told him in one statement that he accidentally killed the decedent, but later changed his statement when Pressley told appellant no one would believe him, since Pressley's testimony that appellant first told him the decedent's death was an accident was evidence of accident mandating that instruction.

*Id.* at 6. Assistant Attorney General ("AAG") Melody J. Brown filed a Response Brief on the State's behalf. ECF No. 26-6. On June 11, 2009, the South Carolina Court of Appeals affirmed Petitioner's conviction and sentence in a published opinion. ECF No. 26-7. In its opinion, the appellate court found that Petitioner was not prejudiced by the admission of Dr. Nichols' opinion that "the 'suspicious circumstances' surrounding [victim's] death indicated a homicide. . . ." based on the trial court's jury instruction as well as the "overwhelming evidence of [Petitioner's] guilt." *Id.* at 9-11. Second, the appellate court held the trial court acted well within its discretion in declining to charge the jury on "defense of accident." *Id.* at 11-12.

Thereafter, Appellate Defenders Dudek and LaNelle C. Durant filed a petition for a writ of certiorari on Petitioner's behalf with South Carolina Supreme Court. ECF No. 26-8. There, Petitioner raised the following issues:

1.

Whether the Court of Appeals erred by ruling pathologist Dr. Clay Nichols could testify that from the circumstances which followed the decedent's death, such as her automobile and other property being taken by her boyfriend, petitioner, for his own use, and the apparent "cover-up" that he opined her death was a homicide, and also was not an accident, since Dr. Nichols opinion in this regard was not admissible under Rule 702, SCRE because this opinion was not based on scientific, technical or other specialized knowledge that was beyond a judgment the jury could make on its own?

2.

Whether the Court of Appeals erred by refusing to charge the defense of accident

where jailhouse snitch and "jailhouse lawyer" John Pressley testified petitioner told him in one statement that he accidentally killed the decedent, but later changed his statement when Pressley told petitioner no one would believe him, since Pressley's testimony that petitioner first told him the decedent's death was an accident was evidence of accident mandating that instruction?

*Id.* at 4. AAG Brown filed the Return on the State's behalf. ECF No. 26-9. On November 17, 2010, the South Carolina Supreme Court granted the petition for a writ of certiorari to review the court of appeals' decision and instructed the parties to file the appendix and appellate briefs. ECF No. 26-10. Petitioner's appellate lawyers filed a brief on his behalf, *see* ECF No. 26-11, and AAG Brown filed the State's brief, *see* ECF No. 26-12. On October 31, 2011, the supreme court affirmed as modified the court of appeals' decision. ECF No. 26-13. Concerning expert Nichols' testimony, the supreme court held: "[b]ecause the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge." *Id.* at 14. Further, the supreme court noted that in some instances expert testimony may invade the province of the jury, but "no such line was crossed in this case." *Id.* Moreover, the court adopted a rule pursuant to Rule 702 of the South Carolina Rules of Evidence "whereby an expert in forensic pathology's opinion testimony as to cause and manner of death is admissible. . ." *Id.* at 16. As to the second appellate issue, the South Carolina Supreme Court agreed with the court of appeals' finding that "there was no evidence to support an accident charge." *Id.* at 18. On November 17, 2011, the supreme court issued the remittitur. ECF No. 26-14.

Petitioner filed an application for Post-Conviction Relief ("PCR") on June 1, 2012 (2012-CP-40-03816). App. 931. Petitioner asserted he was being held in custody unlawfully based on the following grounds, repeated verbatim:

    a) ineffective assistance of counsel.
    b) failure to investigate.

<blockquote>c) Denial of 5th, 6th and 14th Amends. U.S. Const.</blockquote>

App. 933. As facts to support his grounds, Petitioner stated:

<blockquote>
a) Counsel did not render reasonable proff. assistance.<br>
b) Applicant reserves the right to amend this application to include all issues available and does not waive any.
</blockquote>

*Id.* AAG Robert D. Corney filed a Return on behalf of the State. App. 938-810. A PCR hearing was held on September 2, 2014, before the Honorable Robert E. Hood.[4] 945-1035. Petitioner was present and represented by Attorney Kristy Goldberg; AAG Suzanne White appeared for the State. *Id.* Kimberly Collins, a forensic pathologist and witness; Petitioner; and trial counsel Douglas Strickler testified during the PCR hearing. *Id.* In a December 5, 2014 Order of Dismissal, the PCR court denied Petitioner's PCR Application in full, making the following findings of fact and conclusions of law:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has had the opportunity to review the record in its entirety and has heard the testimony and arguments presented at the PCR hearing. This Court has further had the opportunity to observe each witness who testified at the hearing, and to closely pass upon their credibility. This Court has weighed the testimony accordingly. Set forth below are the relevant findings of fact and conclusions of law as required by S.C. Code Ann. § 17-27-80 (2003).

### Ineffective Assistance of Counsel

The Applicant alleges he received ineffective assistance of counsel. In a PCR action, "[t]he burden of proof is on the applicant to prove his allegations by a preponderance of the evidence." <u>Frasier v. State</u>, 351 S.C. 385, 389, 570 S.E.2d 172, 174 (2002) (citing Rule 71.1€ SCRCP). Where ineffective assistance of counsel is alleged as a ground for relief, the Applicant must prove that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." <u>Strickland v.</u>

---

[4] The PCR hearing transcript indicates that an Amended-PCR application was filed on June 20, 2014, "alleging about seven different allegations." *See* App. 949. In the hearing, PCR counsel indicated Petitioner was withdrawing issues "F" and "H." *Id.* Though this Amended-PCR application does not appear to be part of the record before the court, the amended allegations are outlined in the PCR Order of Dismissal. *See* App. 1038-39.

Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692 (1984); Butler v. State, 286 S.C. 441, 334 S.E.2d 624 (1985).

The proper measure of performance is whether the attorney provided representation within the range of competence required in criminal cases. Courts presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Butler, Id. The Applicant must overcome this presumption to receive relief. Cherry v. State, 300 S.C. 115, 386 S.E.2d 624 (1989).

First, the Applicant must prove that counsel's performance was deficient. Under this prong, attorney performance is measured by its "reasonableness under professional norms." Cherry, 300 S.C. at 117, 385 S.E.2d at 625, *citing* Strickland. Second, counsel's deficient performance must have prejudiced the Applicant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Cherry, 300 S.C. at 117-18, 385 S.E.2d at 625. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of trial." Johnson v. State, 325 S.C. 182, 186 480 S.E.2d 733, 735 (1997) (citing Strickland).

> *Counsel failed to sufficiently challenge the forensic pathologist's finding of homicide as a manner of death by failing to adequately cross examine the witness and failing to present expert testimony on defendant's behalf. Counsel failed to seek an instruction by the court regarding the definition of homicide*

Applicant called Dr. Kim Collins, a forensic pathologist, to testify on his behalf. Dr. Collins testified that she has a BS degree from University of Georgia and a MD degree from the Medical College of Georgia. Dr. Collins has had additional training in pathology from Wake Forest, Bowman Gray School of Medicine and the Medical University of South Carolina and is board certified in both anatomical and forensic pathology. Dr. Collins testified that she has been qualified as an expert in forensic pathology in approximately 200 – 220 cases. With no objection from the Respondent, this Court found Dr. Collins qualified as an expert in pathology. Dr. Collins' Curriculum Vitae was received as Court's Exhibit #1.

Dr. Collins testified that she reviewed a variety of materials from the case in order to render an opinion, which she provided in a written report and letter dated June 29, 2014, which was introduced as Applicant's Exhibit #1. Collins reviewed the autopsy report, which was introduced as Applicant's Exhibit #2. Collins also reviewed the incident report, toxicology report, trial transcript, medical records of victim, and handwritten notes from defense counsel. Collins testified that the autopsy report indicated that the victim was found lying on the couch with a decomposed fetus expelled between her legs. The victim's organs were decomposed and there was no microscopic exam of the organs. A toxicology screen and report was completed and indicated no drugs or alcohol in the victim's system. The coroner made a determination that the victim had died of homicide by probable asphyxiation. Collins testified that from her review of the materials

provided to her by Applicant's Counsel, her opinion to a reasonable degree of medical certainty would be that the victim's cause of death was undetermined.

Dr. Collins testified that the five causes of death would be: 1) natural, 2) suicide, 3) homicide, 4) accident, or 5) undetermined. Collins acknowledged that the only possible options based upon the facts in this matter were either homicide or undetermined. Collins testified that the report indicated that there was no trauma to the neck, eyes, face, or hyoid bone. Dr. Collins testified that she did not believe that a maternal death could be ruled out because of the state of decomposition of the body. However, Dr. Collins testified that the victim has been receiving pre-natal care and had seen the doctor regularly since her pregnancy. The victim did not have any known illnesses that would have caused her death, but Collins testified that a full autopsy of both the victim and fetus should have been done. Collins also testified that a full x-ray of the victim and fetus should have been done. Dr. Collins testified that there can be a finding of asphyxia with no visible signs and noted that sometimes a cause of death can be listed as an undetermined cause of death pending law enforcement investigation. Collins testified that a pathologist does not work in a vacuum, but uses the anecdotal history of the case provided by law enforcement, medical personnel, and others to make a determination. Dr. Collins testified that Dr. Nichols testified at trial that he ruled out any natural causes of death, but did not specifically list what he ruled out. Further, Dr. Collins testified that she did not believe that there was any medical or scientific evidence to support a finding of probable asphyxiation.

The Applicant testified that his prior attorney, Jeanette VanGinhoven, had contacted another expert, Dr. Conradi[5] as a possible expert in forensic pathology. However, Applicant testified that he was informed by his attorney that Dr. Conradi would testify the same as the State expert witness with regards to probable asphyxiation.

Counsel testified that he began communicating with Jeanette about the issues with forensic pathology and DNA as early as spring 2006. Counsel testified that he determined following his review of the files that he met with Dr. Nichols and Jeanette on or about August 9, 2006. Counsel testified that there were notes in the file from a conversation that Jeanette had with Dr. Conradi and those notes were introduced as Applicant's Exhibit #4. Counsel testified that he understood from the notes that Dr. Conradi would have testified that based on the autopsy alone, the cause of death would be undetermined, but would also have made the finding of homicide with the additional information, which was consistent with Dr. Nichols' findings. Counsel testified that he did not call Dr. Conradi as a witness because he believed she would testify against the Applicant.

This Court finds that the Applicant has failed to establish his burden of proof that Counsel was ineffective for failing to call an expert to testify as to the cause of

---

[5] The PCR transcript indicates that Petitioner's initial attorney contacted "Dr. Condrati." App. 977-1073. However, the PCR Order of Dismissal spells the name as "Dr. Conradi." App. 1037-57.

death. Although Dr. Collins testified that she would have done additional examination and rule the death undetermined with the information she reviewed, this Court finds the testimony of both the Applicant and Counsel credible as it relates to the fact that an expert was consulted and the strategic decision was made not to call her because of the risk of her supporting the State's expert's findings. While it is true that a criminal defense attorney has a duty to investigate, this duty is limited to reasonable investigation. Ard v. Catoe, 372 S.C. 318, 331, 642 S.E.2d 590, 597 (2007). It is clear that Counsel completed a reasonable investigation by contacting a possible defense expert and forwarding her almost the same materials that were reviewed in preparation by Dr. Collins for this hearing. However, because of the potential risk of the defense expert's testimony supporting the State's expert's findings, Counsel made the strategic decision to not call the expert. Counsel is not required to seek an expert until one is found that will provide the testimony that helps the defense.

This Court also finds that Counsel adequately cross-examined Dr. Nichols as to his findings, in an attempt to call into question the medical findings versus his decision being based on second-hand information provided from police, EMS, and family.

Counsel testified that he completed research on what Dr. Nichols could testify to in regarding the definition of homicide versus murder and determined that Nichols would be restrained by the definition of homicide, which did not deal with intent. Counsel testified that research had also been completed on potential alternative causes of death, but Counsel could not recall what testimony was presented on that issue. Counsel testified that he did not recall why he did not ask the court for an instruction as to the definition of homicide.

The record reflects that Dr. Nichols is board certified as both a forensic and anatomical pathologist and was the Chief Medical Examiner of Richland County. (Tr. p. 531). Dr. Nichols was called to the scene and made an initial examination of the scene and body. (Tr. p. 533-4). Nichols' explanation of his reasoning behind the determination of homicide was based not only on the autopsy, but also on the scene and facts related to the victim's disappearance. (Tr. p. 539-40). The South Carolina Supreme Court noted that Dr. Nichols used the anecdotal history relayed by officers at the scene, together with the lack of normal indicators of physical violence, to render his opinion that the cause of death was asphyxiation, which would not leave physical marks, and that the manner of death was homicide due to the suspicious nature of Victim's death. State v. Commander, 396 S.C. 254, 258, 721 S.E.2d 413, 415 (2011).

Counsel objected when Nichols gave his expert opinion that the cause of death was homicide. (Tr. p. 540, lines 3-4). Following arguments by Counsel and the Solicitor, the Court overruled the objection, but instructed the Solicitor to question Dr. Nichols on his definition of homicide. (Tr. p. 557-8). Dr. Nichols then testified that homicide referred to "a person that has died as a result of another person's actions." (Tr. p. 558, lines 18-9). Counsel cross-examined Dr. Nichols extensively on the time of death, cause of death, and how Nichols

received information related to the circumstances. (Tr. p. 562-577). As a result, Dr. Nichols indicated that he was "not claiming intent." (Tr. p. 576).

The nature and scope of cross-examination is inherently a matter of trial tactics. United States v. Nersesian, 824 F.2d 1294, 1321 (2nd Cir. 1987). "[A] defendant has a 'burden of supplying sufficiently precise information,' of the evidence that would have been obtained had his counsel undertaken the desired investigation and of showing 'whether such information . . . would have produced a different result.'" United States v. Rodriguez, 53 F.3d 1439, 1449 (7th Cir. 1995). The Applicant did not proffer any questions counsel allegedly failed to ask, and did not present any testimony showing Dr. Nichols' answers at trial would have been different. Accordingly, the Applicant has not shown that a different approach to cross-examination would have been beneficial to the defense.

This Court cannot find that Counsel was deficient for failing to request a jury instruction as to the definition of homicide. Counsel testified that it may have been helpful to have the judge charge the jury with the Black's Law Dictionary definition of homicide. Dr. Nichols' testimony was that his definition of homicide did not deal with any intent, but merely meant that the victim "died as a result of another person's actions." (Tr. p. 558). He clarified that he did not believe that the death was a suicide, accidental or a natural death. (Tr. p. 558-9). However, he again clarified that he was "not claiming intent." (Tr. p. 576). Further, during closing arguments, Counsel highlighted the fact that Dr. Nichols said he was not claiming intent, but only saying that the victim's death was a result of someone else's action. (Tr. p. 873). This Court finds that the Applicant has not met his burden of proof of establishing that Counsel was ineffective for failing to request a jury charge as to the definition of homicide.

Further, the South Carolina Supreme Court agreed with the court of appeals that the circumstantial evidence implicating Petitioner was overwhelming. State v. Commander, 396 S.C. 254, 263, 721 S.E.2d 413, 418 (2011). This Court agrees and finds that the Applicant suffered no prejudice as a result of any alleged deficiencies described above.

> *Counsel failed to object to the Court's instruction to the jury that "malice may also rise where a deed is done with a deadly weapon," where this instruction had a tendency to confuse the issues, mislead the jury, and inappropriately shifted the burden to the defense.*

The Applicant alleged that Counsel was ineffective for failing to object to the court's instruction to the jury that "malice may also rise where a deed is done with a deadly weapon." (Tr. p. 905). Applicant argued that because there had been no evidence presented to support the use of a deadly weapon, whether gun or even a pillow, this jury instruction confused the issues. Upon review of the jury instruction and jury instructions as a whole, it does not appear that there was any legal basis on which to base an objection by defense counsel. This Court does not find that the instruction confused the issue, misled the jury, or inappropriately shifted the burden to the defense. The South Carolina Supreme Court has held that

the South Carolina doctrine of implied malice does not shift the burden of persuasion to the defendant. <u>State v. Crocker</u>, 272 S.C. 344, 346, 251 S.E.2d 764, 766 (1979).

The standard of review for appellate purposes is to consider jury instructions as a whole, and "if as a whole they are free from error, any isolated portions which may be misleading do not constitute reversible error." <u>State v. Aleksey</u>, 343 S.C. 20, 27, 538 S.E.2d 248, 251 (2000). Further, "[a]n erroneous malice instruction is harmless if, based on all the evidence presented to the jury, it did not contribute to the verdict." <u>Tate v. State</u>, 351 S.C. 418, 426, 570 S.E.2d 522, 527 (2002).

This Court finds that the Applicant failed to meet his burden of proof as to this claim. First, this Court finds that the jury charge regarding the possible inference of malice with use of a deadly weapon was not improper. However, even if this Court were to find that Counsel should have objected based upon a confusion of the issues, the jury instructions as a whole are free from error and it is unlikely that this portion of the jury charge contributed to the verdict. Therefore, this claim is denied and dismissed.

> *Counsel failed to object to witness John Presley introducing evidence of Applicant's prior arrest for a domestic violence charge against the victim. The evidence was then allowed to be emphasized by the Solicitor in his closing argument.*

John Presley testified to statements made by Applicant after being incarcerated with Applicant for a period at the Alvin S. Glenn Detention Center. Presley acknowledged at the trial that he had an extensive criminal history involving crimes of dishonesty and drugs. (Tr. p. 592; 594-5; 612-3; 615-621). Presley testified that the Applicant told him that Applicant and the victim fought a lot and had received counseling. (Tr. p. 600). Presley briefly testified that Applicant told him that he had been arrested one time for domestic violence after hitting the victim, but the victim later dropped the charges and Applicant was released. (Tr. p. 608). The allegation of domestic violence was not addressed any further by the State or Applicant.

Counsel fully cross-examined Presley on his prior criminal history, paying particular attention to his crimes of forgery and dishonesty. (Tr. p. 615-18, 620-21). Counsel was able to get Presley to admit several times that to commit his crimes he had to lie. (Tr. p. 617; 620-1). Counsel also cross-examined Presley as to his motivation for offering this information to police and the Solicitor. Specifically, Counsel referenced the letters Presley wrote asking for sentence reduction in exchange for his information and testimony. (Tr. p. 629; 633; 639-46). The jury was charged to consider the credibility of each witness, as well as their potential motive for testifying. (Tr. p. 900-901).

Applicant testified that Presley stated that Applicant had been arrested for criminal domestic violence following a report by the victim, but Applicant stated

that the statement was not true. Applicant testified that Counsel should have objected to that statement by Presley.

Counsel testified that looking at the transcript now, he should have objected to Presley's testimony regarding Applicant's prior arrest for criminal domestic violence. However, Counsel acknowledged that it was possible that he did not want to draw additional attention to that statement, especially in light of the fact that he was planning on cross-examining Presley extensively regarding his credibility issues. Counsel addressed Pressley's history of lying during closing arguments. (Tr. p. 870, lines 18, 23-4; p. 878, line 2).

As a rule, evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged is inadmissible. State v. Mathis, 359 S.C. 450, 462, 597 S.E.2d 872, 878 (Ct. App. 2004). In particular, if the prior bad act is not the subject of a conviction, it must first be established by clear and convincing evidence and there must be a logical relevance between the prior bad act and the crime for which the defendant is accused. Id. (citing State v. Braxton, 343 S.C. 629, 541 S.E.2d 833 (2001). Therefore, this Court finds that Counsel was deficient in failing to object to the testimony of Presley regarding the prior bad act of domestic violence. The domestic violence incident was not a prior conviction and there was no determination by the trial court as to whether there was clear and convincing evidence of the act and the act's relevance.

However, this Court cannot find that the Applicant met his burden of proof of establishing any prejudice as a result of Counsel's deficiency. This Court finds that whatever possible inference regarding Applicant's character the jury might have drawn from hearing of domestic violence between the Applicant and victim certainly had minimal effect on the jury's verdict. Particularly in light of the additional information and testimony that was presented regarding Applicant's actions in the months following the victim's death. The jury was provided with testimony that proved that Applicant used the victim's credit cards, checks, vehicle, and phone, to travel through multiple states connecting with various other women and used the victim's cell phone to send misleading and untruthful text messages to the victim's family during this period. "[E]ven if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not a perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). As a result, this Court cannot find that this brief mention of a possible domestic violence incident had an effect on the jury's decision.

*Counsel failed to object to witness John Presley's offered testimony as to his opinion regarding whether the Applicant's statements were true. The evidence was then allowed to be emphasized by the Solicitor in his closing argument*

Presley testified that Applicant first told him that maybe the victim hit him with a stick, at which time he must have become unconscious and fallen on top of the victim and accidentally smothered her, but Presley stated that he never believed

the Applicant. (Tr.p. 604-6). Presley testified that he did not believe that the victim actually hit Applicant with a stick. (Tr. p. 605, lines 9-13). [A] witness permitted to give an opinion under Rule 608(a) must restrict the opinion to 'character for truthfulness,' and may not testify whether the witness believes a specific statement or account given by another witness." <u>State v. McKerley</u>, 397 S.C. 461, 465, 725 S.E.2d 139, 141 (Ct. App. 2012), reh'g denied (May 21, 2012). Counsel, upon review of the transcript, testified that he could not recall a reason he had for not objecting to Presley's comment as to whether he believed the Applicant.

This Court finds that Counsel was deficient for failing to object to Presley's comment on the truthfulness of Applicant; however, this Court finds no prejudice from this failure to object. The jury was given the option of believing any or all of Presley's testimony. The jury was also presented by Presley's history of lying and criminal behavior. In light of the fact that the circumstantial evidence implicating Petitioner was overwhelming, this Court finds that the failure to object did not affect the outcome of the trial.

> *Counsel failed to effectively communicate with Applicant in making the decision to not present exculpatory DNA evidence at trial. Further, Counsel failed to object and request a mistrial when the Solicitor improperly made a statement during closing argument that no DNA was found at the scene and that Applicant used the gloves*

Applicant testified that he consented to his DNA sample being taken. Applicant testified that he was told by Counsel that the DNA report was exculpatory, but Applicant did not receive a copy of the results until after trial. Applicant testified that he spoke with Counsel regarding the DNA and the fact that the DNA found inside the gloves from the victim's home did not match Applicant. However, Applicant testified that Counsel informed him that because the State did not introduce the report and evidence during trial, if Counsel introduced the report, they would lose last argument and Counsel thought that it was in Applicant's best interest to have last argument.

The DNA report from SLED was introduced as Applicant's Exhibit #2. Counsel testified that he was provided with the report more than a year after it had been completed. Counsel testified that the report excluded Applicant as a contributor to the DNA found in the gloves at the victim's home, but identified the victim and an unknown male's DNA. Counsel testified that he did object to testimony regarding possible DNA from fingernail scrapings from the investigator from the Richland County Sheriff's office, but based upon a lack of foundation. (Tr. p. 803, lines 6-9). Counsel testified that the absence of Applicant's DNA and presence of an unknown person's DNA on the gloves was absolutely irrelevant to the case because there was no real connection between the gloves and the victim's death.

Counsel testified that on cross-examination and in closing, he was able to point out to the jury that although DNA had been tested from both the fingernail scrapings and the rubber gloves, they had never heard the result. (Tr. p. 806; p.

879-880). Counsel also raised the lack of DNA testing on the fetus during his closing argument. (Tr. p. 879). Counsel pointed out to the jury that had any of the DNA tests resulted in a match to Applicant, surely the State would have brought in people and reports to use at trial. (Tr. p. 880). Counsel emphasized the fact that if there was anything to indicate that Applicant used the gloves to clean up the scene, the State would have brought in people to testify. (Tr. p. 880).

This Court finds that the Applicant failed to meet his burden of proof as to this claim. This Court finds that Counsel's strategy of preserving last argument was a valid strategic decision, especially in the light of the fact that he could argue that the State failed to present any evidence that Applicant was a match to any DNA tested. Where counsel articulates valid reasons for employing a certain strategy, counsel's choice of tactics will not be deemed ineffective assistance. Whitehead v. State, 308 S.C. 119, 417 S.E.2d 530 (1992).

Applicant also alleged that Counsel failed to object and request a mistrial when the Solicitor made an improper statement during closing arguments about the gloves and DNA. (Tr. p. 849, lines 19-23). Counsel, upon review of the transcript, testified that he should have objected to this portion of the closing argument. However, this Court has reviewed the record and finds no merit to Applicant's claim that Counsel was ineffective for failing to object to this portion of closing or for failing to request a mistrial. "A solicitor's closing argument . . . should stay within the record and reasonable inferences to it." Simmons v. State, 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998). This Court finds that the Solicitor's closing argument was supported by reasonable inferences from the testimony and evidence presented at trial.

This Court cannot find that Counsel was deficient for failing to request a mistrial. A defendant must show both error and resulting prejudice in order to be entitled to a mistrial and a mistrial should only be granted when "absolutely necessary." State v. Thompson, 352 S.C. 552, 560-61, 575 S.E.2d 77, 82 (Ct. App. 2003). Even if Counsel was deficient for failing to object, on appeal, Applicant would have had the burden of proving that he did not receive a fair trial because of the alleged improper argument. Simmons v. State at 338, 166. This Court finds that the Applicant has failed to meet his burden of proof as to this claim.

Further, the South Carolina Supreme Court agreed with the court of appeals that the circumstantial evidence implicating Petitioner was overwhelming. State v. Commander, 396 S.C. 254, 263, 721 S.E.2d 413, 418 (2011). This Court agrees and finds that the Applicant suffered no prejudice as a result of any alleged deficiencies described above.

> Counsel failed to request a mistrial when Solicitor incorrectly advised the jury that they were allowed to consider events occurring after the death of the victim and use these events to infer malice existed at the time of the death. Although the trial court correctly instructed the jurors that "malice must exist in the mind of the defendant just before and at the time that the act is committed," the court later refused to instruct the jury as to the

*Solicitor's version of the law creating confusion in the minds of the jurors as to what the law regarding malice allowed. Counsel again failed to request a mistrial.*

During closing arguments, Counsel objected to the Solicitor's statement regarding malice and the use of events following the act to infer malice. (Tr. p. 842-3). However, following a bench conference, the objection was overruled and the Solicitor informed the jury, "you can take statements and actions made after the events have happened and infer malice existed at the time this happened." (Tr. p. 843).

The trial court then charged the jury that:

Malice is hatred, ill-will or hostility towards another person. It is the intentional doing of a wrongful act without cause or excuse and with an intent to inflict an injury or under circumstances that the law would infer an evil intent.

Malice aforethought does not require that the malice exist for any particular time before the act is committed, but malice must exist in the mind of the Defendant just before and at the time that the act is committed. Therefore, there must be a combination of the previous evil intent and the act.

Malice aforethought may be expressed or inferred. Now, these terms expressed and inferred do not mean different kinds of malice, but merely the manner in which malice may be shown to exist; that is, either by direct evidence or by inference from the facts and circumstances which are proven.

. . .

Malice may be inferred from conduct showing a total disregard for human life.

(Tr. p. 903-4) (emphasis added).

Following the trial court's charge, the Solicitor requested the trial court charge the jury that "if they believe acts by the Defendant after the event . . . showed malice . . . that could be an inference of malice if they felt that was [Defendant's] state of mind at the time of the incident." (Tr. p. 913). Counsel argued against the requested amended charge and the trial court refused to amend the charge, leaving the jury with his standard malice charge. (Tr. p. 913-5).

Counsel acknowledged that he did not request a mistrial based on the Solicitor's comments during closing, but testified that he did discuss the issue with Applicant and made a strategic decision to not request a mistrial because he believed that any incorrect comment made by the Solicitor during closing was cured by the jury instructions. Where counsel articulates valid reason for employing a certain

strategy, counsel's choice of tactics will not be deemed ineffective assistance. <u>Whitehead v. State</u>, 308 S.C. 119, 417 S.E.2d 530 (1992). This Court finds that the Applicant failed to meet his burden of proof as to this allegation.

**Overwhelming Evidence**

This Court notes that although Counsel may have been deficient in failing to object to portions of Presley's testimony, because of the overwhelming circumstantial evidence, this Court cannot find any prejudice from any deficiencies. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Smith v. State</u>, 386 S.C. 562, 565, 689 S.E.2d 629, 631 (2010). "Moreover, no prejudice occurs, despite trial counsel's deficient performance, where there is otherwise evidence of the defendant's guilt." <u>Rosemond v. Catoe</u>, 383 S.C. 320, 325, 680 S.E.2d 5, 8 (2009).

After the victim was found dead in her home, Applicant was found in New Orleans, Louisiana, after traveling through three states and using one of the victim's credit cards to secure a hotel room for several nights in each state. (Tr. p. 652). Applicant was arrested at a hotel by the New Orleans Police Department. At the time of his arrest, Applicant was in possession of the victim's vehicle, victim's birth certificate, ID card of victim's ex-husband, ultrasound photo, victim's checkbook, victim's eight credit cards, and victim's driver's license. (Tr. p. 669-671; 703-4). Police also found the keys to the victim's vehicle in Applicant's hotel room. (Tr. p. 676). Detective Dejean testified that he inspected items found in the victim's vehicle, which included a purse containing a medical appointment card for Midlands OB-GYN, checks, medical slip for Pastoral Counseling Services with the victim's name as a client, and a receipt for a Cracker Barrel in Columbia, SC, for November 29, 2004, at 9:55 am. (Tr. p. 736-8).

At trial, Captain Laviolette testified that when the police entered the hotel room, Applicant held a gun to his head and made the statement, "Get out of the room; I'm going to kill myself like I killed Vonnie." (Tr. p. 656). Sgt. Pari testified that he saw applicant hold a gun to his head and state, "Get out, I'm going to kill myself like I killed Vonnie." (Tr. p. 699). Pari also testified to three room service receipts found in the hotel room, each signed with the name of Gervonya Goodwin. (Tr. p. 705-6). Sgt. Crayton testified that he assisted in locating the victim's vehicle in the hotel parking garage (Tr. p. 719). Crayton also testified that he saw Applicant holding a gun towards his head and heard Applicant say, "Get out, I'm going to kill myself like I killed Vonnie." (Tr. p. 721).

Officer Buzali testified that he assisted in the arrest of Applicant and transport of Applicant to the police station. Buzali testified that while he was transporting Applicant, Applicant stated spontaneously, "I just did what I had to do." (Tr. p. 754).

Following the jury instructions, the jury took less than 45 minutes to return with a verdict of guilty on the charge of murder. Exhibits and verdict form was sent to the jury at 3:24 pm and the jury returned to open court with their verdict at 4:10 pm. (Tr. p. 916).

The South Carolina Supreme Court, referencing disputed testimony of Dr. Nichols during the trial, found that the admission of the testimony was harmless in light of the overwhelming evidence of Commander's guilt. State v. Commander, 384 S.C. 66, 75, 681 S.E.2d 31, 35-36 (Ct. App. 2009) aff'd as modified, 396 S.C. 254, 721 S.E.2d 413 (2011) (citing State v. Mizzell, 349 S.C. 326, 333, 563 S.E.2d 315, 318 (2002) (holding that whether error is harmless depends on the facts of each case, including the importance of challenged testimony in prosecution's case, whether the testimony was cumulative, presence or absence of evidence corroborating or contradicting testimony on material points, extent of cross-examination otherwise permitted, and overall strength of prosecution's case)).

Based upon the overwhelming circumstantial evidence of Applicant's guilt, this Court cannot find any prejudice suffered as a result of any alleged deficiencies on Counsel's behalf. This Court finds that it is improbable that any alleged deficiencies affected the outcome of the trial. Therefore, all claims are denied and dismissed.

## Cumulative Error

Applicant also argued that because there are multiple instances of deficiency on Counsel's behalf, the application should be granted based upon the open question of law in South Carolina regarding cumulative error. This Court finds that the doctrine of cumulative error, although often raised in post-conviction relief proceedings, contradicts the use of the Strickland two prong test, requiring both deficiency and prejudice for a finding of ineffective assistance of counsel. Therefore, this Court finds that it is not an appropriate test for a determination of ineffective assistance of counsel.

## Conclusion

Based on all the foregoing, this Court finds and concludes that the Applicant has not established any constitutional violations or deprivations that would require this court to grant his application. This Court finds that the Applicant's allegations that he was denied effective assistance of trial counsel is without merit. When an ineffectiveness claim is presented the defendant must show that counsel's representation was deficient. Deficient representation amounts to conduct that is not objectively reasonable under the circumstances. Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052 (1984). In addition, the Applicant must show that the outcome of his proceeding was prejudiced and it is reasonably probable that the outcome would have been different had counsel's performance not been deficient. Strickland, 466 U.S. at 694. This Court finds that the Applicant's attorney demonstrated a normal degree of skill, knowledge and professional

judgment that is expected of an attorney who practices criminal law. State v. Pendergrass, 270 S.C. 1, 239 S.E.2d 750 (1977); Strickland, supra; Butler v. State, 286 S.C. 441, 334 S.E.2d 813 (1985). Therefore, this application for post conviction relief must be denied and dismissed with prejudice.

This Court cautions Applicant that he must file and serve a notice of appeal within thirty (30) days from the receipt by counsel of written notice of entry of judgment to secure the appropriate appellate review. See Rule 203, SCACR. Pursuant to Austin v. State, 305 S.C. 453 (1991), an Applicant has a right to an appellate counsel's assistance in seeking review of the denial of PCR. Rule 71.1(g), SCRCP, provides that if the applicant wishes to seek appellate review, PCR counsel must serve and file a Notice of Appeal on the Applicant's behalf. Your attention is directed to South Carolina Appellate Court Rule 243 for appropriate procedures for appeal.

**IT IS THEREFORE ORDERED**:

1. That the Application for Post-Conviction Relief must be denied and dismissed with prejudice; and

2. The Applicant must be remanded to the custody of the Respondent.

App. 1037-1056.

Appellate Defender Robert M. Pachak filed a *Johnson*[6] petition for a writ of certiorari on Petitioner's behalf with South Carolina Supreme Court. ECF No. 26-15. The sole issue presented in the petitioner was: "Whether defense counsel was ineffective in failing to object to witness John Presley introducing evidence of a prior bad act of petitioner's which was a prior domestic violence charge against the victim?" *Id.* at 3. After the supreme court advised Petitioner of his right to file a pro se response to the *Johnson* petition, *see* ECF No. 26-16, on June 11, 2015, Petitioner filed his pro se response, ECF No. 26-20.

In his pro se petition, Petitioner presented the following issues:

- Was trial counsel ineffective in failing to object when witness John Presley introduced evidence of petitioner's prior domestic violence against the victim?
- Was trial counsel ineffective in failing to object when witness John Presley offered testimony as to his opinion regarding the truth of petitioner's statements describing the manner of the victim's death?

---

[6] *Johnson v. State*, 364 S.E.2d 201 (1988).

- Was trial counsel ineffective in failing to sufficiently challenge the forensic pathologist's findings of homicide as a manner of death?
- Was trial counsel ineffective in failing to effectively communicate with petitioner regarding the decision not to present the evidence that petitioner's DNA was absent from the scene of the crime and in failing to request a mistrial when the solicitor implied petitioner's DNA evidence was present at the scene of the crime during closing arguments?
- Was trial counsel ineffective in failing to request a mistrial when the solicitor advised the jurors that they could consider events occurring after the victim's death in determining whether malice was present to support a charge of murder?
- Was trial counsel ineffective in failing to object to the court's instruction that "inferred malice may also rise where a deed is done with a deadly weapon?"
- Was petitioner prejudiced by trial counsel's cumulative errors?

ECF No. 26-20; 26-23 (quoting from South Carolina Supreme Court's Order).

In an order dated July 24, 2015, the South Carolina Supreme Court denied appellate counsel Pachak's request to be relieved as counsel and directed the parties "to address the questions raised in the petition and the pro se response to the petition." ECF No. 26-21. Appellate Defender Pachak filed the amended petition ("petition two") and presented the following issue only: "Whether defense counsel was ineffective in failing to object to witness John Presley introducing evidence of a prior bad act of petitioner's which was a prior domestic violence charge against the victim?" ECF No. 26-22. In a September 16, 2015 order, the supreme court found that appellate counsel failed to address the seven issues Petitioner raised in his pro se response to the *Johnson* petition (see above). ECF No. 26-23. After re-briefing by appellate counsel, *see* ECF No. 26-24, the AAG J. Clayton Mitchell filed a Return on the State's behalf, *see* ECF No. 26-25. On July 18, 2016, the supreme court denied the petition for a writ for certiorari, *see* ECF No. 26-26, and on August 3, 2016, the supreme court issued the remittitur, *see* ECF No. 26-27. This federal habeas Petition followed and was filed on November 22, 2016. ECF No. 1.

III.    Discussion

A.  Federal Habeas Issues

Petitioner raises the following issues in his federal Petition for a Writ of Habeas Corpus, quoted verbatim:

GROUND ONE: Whether the trial court erred by ruling pathologist Dr. Clay Nichols could testify that from the circumstances which followed the decedent's death, such as her automobile and other property being taken by her boyfriend, appellant, for his own use, and the apparent "cover-up" that he opined her death was a homicide, and also was not admissible under Rule #702, SCRE because this opinion was not based on scientific, technical or other specialized knowledge that was beyond a judgment the jury could make on its own?

Supporting Facts: The State's case was based entirely on circumstantial evidence or an mere theory. The trial court did in fact erred in ruling that Dr. Nichols could testify to the circumstances of the decedent's death in violation of the Constitution, laws or treaties of the United States. The United States Supreme Court case of * Estelle v. Smith, (1981) which it is contended made inadmissible that Dr. Nichols testimony was not based on scientific, technical or other specialized knowledge, but, rather an opinion. The judgment that the jury could only make was tooken away and deprived the petitioner of his due process rights to receive an fair trial. The petitioner believes that he was entitled to an jury instruction of involuntary manslaughter. The petitioner asserts that he has complied with the state court exhaustion rules and has presented his claims to the state's highest court. ECF No. 1 at 8.

GROUND TWO: Whether the court erred by refusing to charge the defense of accident where jailhouse snitch and "jailhouse lawyer" John Presley testified appellant told him in one statement that he accidentally killed the decedent, but later changed his statement when Presley told appellant no one would believe him, since Presley's testimony that appellant first told him the decedent's death was an accident was evidence of accident mandating that instruction?

Supporting facts:  The court was in err by refusing to charge the defense of an accident that would have made the charge an lesser included offense. The results of the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Not, only was it unreasonable but contrary to, and it involved an unreasonable application of clearly established Federal law as determined by the Supreme Court. The petitioner contends that he was entitled to an lesser included offense or involuntary manslaughter. The petitioner was found guilty of murder. The petitioner contends that had the prosecution not have withheld the exculpatory evidence from the jury, the outcome of the proceedings would have been different. Murder is the killing of any person with malice aforethought. Malice is the wrongfully intent to injure another and indicates a wicked or depraved spirit

intent on doing wrong. *Id.* at 11.

GROUND THREE: Whether the petitioner was deprived of his Sixth Amendment rights to an fair trial, and deprived of his rights to effective assistance of counsel during his "critical stage" trial by jury?

Supporting Facts: The petitioner was deprived of of an fair trial which in the case of * United States v. Morrison, 449, U.S. 361, 364, (1981) Unless the accused receives the effective assistance of counsel a serious risk of injustice infects the trial itself. In the case of *Engle v. Isaac, 456, U.S. 107, (1982) The Court referred to the criminal defendant's constitutional guarantee of a fair trial and competent attorney. In the case of * Jones v. Barnes, 463, U.S. 745, 758, (1983), To satisfy the constitution counsel must function as an advocate for the defendant, as opposed to a friend of the court. The Counsel's opening remarks made it clear to the jury that her client was guilty of the offense charged. Counsel's deficient performance was indeed prejudicial. It is the defendant's burden to challenge the jury's instruction, the petitioner asserts that the trial court's jury instruction was ambiguous and that there was reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond reasonable doubt. See *Waddington v. Sarausad, -U.S.- 172 L.Ed. 532, 129, S.Ct. 823, (2009). *Id.* at 12.

GROUND FOUR: Ineffective Assistance of Counsel.

Supporting Facts: (a). Counsel failed to sufficiently challenge the forensic pathologist's findings of homicide as a manner of death by failing to adequately cross examine the witness and failing to present expert testimony on defendant's behalf. Counsel failed to seek an instruction by the court regarding the definition of homicide. Counsel abandoned any notion that the jury might be persuaded to find her client guilty of the lesser crime manslaughter on the theory that the victim's homicide was committed during an heated argument. There was also an abandonment that maybe her client was insane at the time of the offense. At, the least counsel should have requested an jury instruction on that lesser included offense. The court's decision that counsel was not ineffective and denying the petitioner's application for relief, in the case of *Williams v. Taylor, 529 U.S. 362, 146, L.Ed.2d. 389, 120, S.Ct. 1495 (2000). was contrary to or it involved an unreasonable application of clearly established Federal law. The question is whether the petitioner's constitutional rights to receive effective assistance of counsel as defined in Strickland v. Washington, was violated?

(2). Counsel failed to object to the Court's jury instruction that "malice may also rise where a deed is done with a deadly weapon," where this instruction had a tendency to confuse the issues, mislead the jury, and inappropriately shifted the burden to the defense.

(3). Counsel failed to object to witness John Presley introducing evidence of the

petitioner's prior arrest for a domestic violence charge against the victim. The evidence was then allowed to be emphasized by the Solicitor in his closing argument.

(4). Counsel failed to effectively communicate with the petitioner while making the decision no to present exculpatory DNA evidence at trial. Further, Counsel failed to object to improper statement by the Solicitor, nor did counsel request an mistrial when the Solicitor improperly introduced during her closing argument that there was no DNA physical evidence found at the crime scene because the petitioner used gloves.

Counsel has an obligation or an duty to defend and protect the constitutional rights of her client. Where the material facts were not adequately developed at the state court hearings, the petitioner believed that he is entitled under both 28 U.S.C. § 2254(d) and the case of * Townsend v. Sain, 372 U.S. 293, to an evidentiary hearing in federal court. Trial counsel failed to use sound strategy. *Id.* at 15-16.

GROUND FIVE: Actual Innocence.

Supporting Facts: Finding out about the exculpatory evidence after trial has become newly discovered evidence that could have changed the outcome of my trial proceedings. *Id.* at 19.

B.  Standard for Summary Judgment

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the Court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

C. Habeas Corpus Standard of Review

1. Generally

Because Petitioner filed his Petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)(2); *see Williams v. Taylor*, 529 U.S. 362, 411 (2000). "[A] federal habeas

court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 410.

a.  Deference to State Court Decisions

Courts afford deference to state courts' resolutions of the habeas claims of state prisoners. *See Bell v. Cone*, 543 U.S. 447, 455 (2005).  The Supreme Court has provided further guidance regarding the deference due to state-court decisions.  *Harrington v. Richter*, 562 U.S. 86 (2011); *Cullen v. Pinholster*, 563 U.S. 170 (2011).  To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103.  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.  The Court further stated: "If this standard is difficult to meet, that is because it was meant to be."  *Id.*; *see Richardson v. Branker*, 668 F.3d 128, 137-44 (4th Cir. 2012) (quoting *Harrington* extensively and reversing district court's grant of writ based on his ineffective assistance of counsel claims).

In interpreting § 2254(d)(1) and discussing the federal courts' role in reviewing legal determinations made by state courts, the United States Supreme Court held as follows:

> [A] federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States.

*Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting from § 2254(d)(1)(emphasis added in original)).  "Clearly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to

the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). In considering whether a state-court decision is "contrary to" clearly established federal law, the federal court may not grant relief unless the state court arrived at a conclusion opposite to that reached by the Supreme Court on a legal question, the state court decided the case differently than the Court has on facts that are materially indistinguishable, or if the state court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 405-13. The "unreasonable application" portion of § 2254(d)(1) "requires the state court decision to be more than incorrect or erroneous[,]" it "must be objectively unreasonable," which is a higher threshold. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citation omitted).

Section 2254(e)(1) requires the federal court give a presumption of correctness to state-court factual determinations and provides that a petitioner can only rebut such a presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, a habeas petitioner is entitled to relief under § 2254(d)(2), only if he can prove, by clear and convincing evidence, that the state court unreasonably determined the facts in light of the evidence presented in state court.

### b. Ineffective Assistance of Counsel

The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel in a criminal trial and first appeal of right. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court announced a two-part test for adjudicating ineffective assistance of counsel claims. First, a petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687. Second, the petitioner must show that this deficiency prejudiced the defense. *Id.* at 694. The United States

Supreme Court's 2011 decisions cited previously elaborate on the interplay between *Strickland* and § 2254, noting the standards are "both highly deferential," and "when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted); *Pinholster*, 131 S. Ct. at 1403.

Further, in *Pinholster*, the Court held for the first time that the federal court's habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. 131 S. Ct. at 1398. The Court explained that "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399. In the *Pinholster* case, the district court had conducted an evidentiary hearing and considered new evidence in connection with its review and granting of the petitioner's writ based on a finding of ineffective assistance of counsel. *Id.* at 1397. In an en banc decision, the Ninth Circuit Court of Appeals affirmed the district court's grant of the writ. *Id.* The United States Supreme Court granted certiorari and reversed the Ninth Circuit, finding that the district court should not have considered additional evidence that had not been available to the state courts. 131 S. Ct. at 1398. Because the federal habeas scheme "leaves primary responsibility with the state courts," and "requires that prisoners ordinarily must exhaust state remedies," the Court held that to permit new evidence to be presented in a federal habeas court "would be contrary to that purpose." 131 S. Ct. at 1399 (internal citation and quotation marks omitted).

When a petitioner raises in a § 2254 habeas petition an ineffective-assistance-of-counsel claim that was denied on the merits by a state court, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable[,]" not "whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an

*incorrect* application of federal law.'" *Id.* (citing *Williams*, 529 U.S. at 410) (emphasis in original). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

> 2. Procedural Bar

Federal law establishes this Court's jurisdiction over habeas corpus petitions. 28 U.S.C. § 2254. This statute permits relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States[,]" and requires that a petitioner present his claim to the state's highest court with authority to decide the issue before the federal court will consider the claim. 28 U.S.C. § 2254(a)-(b). The separate but related theories of exhaustion and procedural bypass operate in a similar manner to require that a habeas petitioner first submit his claims for relief to the state courts. A habeas corpus petition filed in this court before the petitioner has appropriately exhausted available state-court remedies or has otherwise bypassed seeking relief in the state courts will be dismissed absent unusual circumstances detailed below.

> a. Exhaustion

Section 2254 contains the requirement of exhausting state-court remedies and provides as follows:

(b)      (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that—

         (A)      the applicant has exhausted the remedies available in the courts of the State; or

         (B)      (i) there is an absence of available State corrective process; or

                 (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in

the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c)     An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The statute requires that, before seeking habeas corpus relief, the petitioner first must exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997), *overruled on other grounds by U.S. v. Barnette*, 644 F.3d 192 (4th Cir. 2011). Thus, a federal court may consider only those issues that have been properly presented to the highest state courts with jurisdiction to decide them.

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction: (1) through a direct appeal; or (2) by filing an application for PCR. State law requires that all grounds be stated in the direct appeal or PCR application. Rule 203, SCACR; S.C. Code Ann. § 17-27-10, *et seq.*; S.C. Code Ann. § 17-27-90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as is required by section 17-27-80 of the South Carolina Code, counsel for the applicant must make a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP. Failure to do so will result in the application of a procedural bar by the South Carolina Supreme Court. *Marlar v. State*, 653 S.E.2d 266, 267 (S.C. 2007). Strict time deadlines govern direct appeals and the filing of a PCR in the South Carolina courts. A PCR must be filed within one year of the judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

Furthermore, in filing a petition for habeas relief in the federal court, a petitioner may

present only those issues that were presented to the South Carolina Supreme Court or the South Carolina Court of Appeals. *See State v. McKennedy*, 559 S.E.2d 850, 853 (S.C. 2002) (holding "that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing and certiorari following an adverse decision of the Court of Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error") (quoting *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, 471 S.E.2d 454, 454 (S.C. 1990)).

b.     Procedural Bypass

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner who seeks habeas corpus relief as to an issue failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

The South Carolina Supreme Court will refuse to consider claims raised in a second appeal that could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the United States Supreme Court explains:

[state procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed v. Ross*, 468 U.S. 1, 10-11 (1984).

However, if a federal habeas petitioner can show both (1) "'cause' for noncompliance with the state rule[,]" and (2) "'actual prejudice resulting from the alleged constitutional violation[,]'" the federal court may consider the claim. *Smith v. Murray*, 477 U.S. at 533 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). When a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

If a federal habeas petitioner has failed to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. A federal court is barred from considering the filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Matthews*, 105 F.3d at 915 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996)).

### 3. Cause and Actual Prejudice

Because the requirement of exhaustion is not jurisdictional, this court may consider claims that have not been presented to the South Carolina Supreme Court in limited circumstances in which a petitioner shows sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. *Murray v. Carrier*, 477 U.S. at 495-96. A petitioner may

prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor that hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. *Id.* Absent a showing of cause, the court is not required to consider actual prejudice. *Turner v. Jabe*, 58 F.3d 924, 931 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. *Murray v. Carrier*, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error.

IV.    Analysis

Respondent concedes that all five habeas claims meet the exhaustion requirement. ECF No. 26 at 18-19. However, concerning Petitioner's first two habeas grounds, Respondent maintains these trial-court-error grounds are not cognizable on habeas review. *Id.* at 18. Specifically, Respondent argues: "Grounds One and Two present only state law claims and are not cognizable. Thus, an exhaustion analysis is not applicable." *Id.* Concerning Petitioner's ineffective-assistance-of-counsel ("IAC") claims in Grounds Three and Four, Respondent maintains "these claims appear to be properly exhausted and ripe for consideration under the deferential standards established for section 2254 case review." *Id.* at 19. Finally, concerning Petitioner fifth habeas ground, Respondent argues "actual innocence is not cognizable as a freestanding claim in a Section 2254 action and an exhaustion analysis is not applicable." *Id.* The court will consider all habeas grounds and arguments in turn.

1.  Ground One:  Trial court ruling on expert witness testimony

In his first ground, Petitioner argues that the trial court erred in allowing the expert witness to opine that the victim's death was a homicide and that his opinion was admissible under Rule 702 of the South Carolina Rules of Evidence. ECF No. 1 at 8. Further, Petitioner

argues that the opinion was not based on scientific, technical or other specialized knowledge that was beyond a judgment the jury could make on its own. *Id.* Petitioner argues that this deprived him of "his due process rights to receive a fair trial." *Id.* Respondent argues that Ground One was raised "only as [a] state law issue[]. . . ." ECF No. 26 at 15. More specifically, Respondent maintains there were no federal claims raised in the direct appeal where Ground One was presented. *Id.* at 18. Moreover, Respondent contends that "there is no indication that Petitioner would show a violation that would afford relief." *Id.* at 21.

Initially, the undersigned finds that Petitioner did not present a constitutional issue to South Carolina trial or appellate courts. As indicated in the background section of this Report, on direct appeal, Petitioner argued that the trial court erred in admitting Dr. Nichols' testimony into evidence. ECF No. 26-5. There, Petitioner argued the State expert's testimony that victim's death was a homicide was not admissible under Rule 702 of the South Carolina Rules of Evidence. *Id.* at 2. The same issue was raised in Petitioner's appeal to the South Carolina Supreme Court. ECF No. 26-8. Further, Petitioner's appellate briefs do not mention any of his constitutional rights were violated but focuses on a South Carolina evidentiary rule.

In the case of *Anderson v. Harless*, 459 U.S. 4, 6 (1982), the Supreme Court held that a habeas claim was barred because it was plain from the record that a constitutional argument was never presented to, or considered by, the state court. The Court held that 28 U.S.C. § 2254 "requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (internal citation omitted). Further, the petitioner must have "'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Id.* The Fourth Circuit Court of Appeals cited to

the *Anderson* case in considering whether an issue was procedurally barred in *Pethtel v. Ballard*, 617 F.3d 299, 306 (4th Cir. 2010). There, the Fourth Circuit held as follows:

> [A] federal habeas court may consider only those issues which have been 'fairly presented' to the state courts. *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Although the claims presented need not be "identical," *see Ramdass v. Angelone*, 187 F.3d 396, 409 (4th Cir.1999), the petitioner must present the "'substance' of his federal habeas corpus claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Presenting the "substance" of the claim requires that the claim "be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick." *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994) (quoting *Martens v. Shannon*, 836 F.2d 715, 717 (1st Cir. 1988)). "In other words, fair presentation contemplates that 'both the operative facts' and the 'controlling legal principles' must be presented to the state court." *Matthews*, 105 F.3d at 911 (quoting *Verdin v. O'Leary*, 972 F.2d 1467, 1474 (7th Cir. 1992)).

*Id.* Therefore, this issue is procedurally barred because Petitioner did not raise any federal constitutional issue at the trial court or state court appellate level. *See e.g., Lopez v. Cartledge*, No. 4:13–2872–BHH, 2015 WL 5554562, at *17 (D.S.C. Sept. 21, 2015), *appeal dismissed*, No. 15–7653, 2016 WL 1259696 (4th Cir. Mar. 31, 2016); *Johnson v. Mauney*, No. 1:11–1753–RMG–SVH, 2012 WL 2149763, at *7 (D.S.C. May 18, 2012), *report and recommendation adopted*, No. 1:11–1753–RMG, 2012 WL 2154177 (D.S.C. June 13, 2012); *Walker v. Warden of Broad River Corr. Inst.*, No. 1:09–2672, 2010 WL 3701331, at *8 (D.S.C. Sept. 14, 2010). To the extent the district court finds a federal or constitutional issue was raised, the undersigned finds no error.

Ground One is based on the expert testimony of Dr. Clay L. Nichols, a forensic pathologist. App. 529-581. During his line of questioning, the State asked Dr. Nichols if he came "to a preliminary conclusion as the cause of death." App. 539. In response, Dr. Nichols testified:

> Given the fact that this woman died under suspicious circumstances, that the history I was given was that her -- she was already in her house, no one had talked to her for a period of time, her car was missing, her purse was missing, there was

some indication that somebody was sending text messages to family members indicating that the dead woman, Gervonya Goodwin, was still alive, this indicated an extremely suspicious circumstances, and I felt that we were dealing with a homicide.

App. 539-40. At this point, Petitioner's trial counsel lodged an objection to the "doctor's rendering an opinion as to the cause of death." App. 540. Further, trial counsel argued that Dr. Nichols was "rendering an opinion on the issue the jury has to decide." *Id.* After excusing the jury and hearing arguments from both sides, the trial court overruled the objection with the stipulation from the State that it would have Dr. Nichols clarify what his definition of "homicide" was to the jury. App. 540-556. Dr. Nichols testified that his definition of "homicide" was "[a] person that has died as a result of another person's actions." App. 558. Further, Dr. Nichols opined that in this case he did not believe the victim died as a result of natural causes nor was the death accidental or a suicide. App. 558-59. Ultimately, Dr. Nichols opined that the victim died as a result of asphyxiation. App. 559.

The Fourth Circuit Court of Appeals has stated: "Importantly, in considering federal habeas corpus issues involving state evidentiary rulings, 'we do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" *Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008) (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir. 2000)); *see also Harrington v. Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 442 U.S. 307, 332 n. 5 (1998)) ("Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."). Federal habeas review of a state court's evidentiary rulings is limited to a consideration of whether any prejudice from the admission (or exclusion) of the evidence of the acts so outweighed its probative value as to give rise to "circumstances impugning fundamental

fairness or infringing specific constitutional protections." *Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir. 1960); *see Norris v. South Carolina*, 309 F. Supp. 1113, 1117 (D.S.C. 1970) (internal citation and reference omitted) ("Normally, the admissibility of evidence . . . in state trials are matters of state law and procedure not involving federal constitutional issues. It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented. The role of a federal habeas corpus petition is not to serve as an additional appeal.").

Following review of the record in this case and the parties' contentions, the undersigned finds that Petitioner has not sustained his burden of showing that the trial court's ruling— allowing Dr. Nichols to opine that the victim died as a result of a homicide—constituted an unreasonable application of federal law or that it was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Here, both the state trial court and the appellate courts in this matter based their rulings on an interpretation of Rule 702, SCRE. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Therefore, this court cannot conclude that the state trial court or the state appellate courts' determinations on the issue were contrary to, or an unreasonable application of, clearly established federal law. The undersigned must agree with the state court's application of its own law to the facts of this case and find that the trial court's admission of expert testimony was not unlawful or unconstitutional. Accordingly, the undersigned recommends the district court find Petitioner's due-process rights were not violated and grant Respondent's Motion for Summary Judgment concerning Ground One.

    2. Ground Two: Trial court refusal to charge jury on defense of accident

In Ground Two, Petitioner argues the trial court erred in refusing to charge the jury on the "defense of accident." ECF No. 1 at 11. Petitioner argues that John Presley, a jailhouse snitch/lawyer, testified that Petitioner "told him in one statement that he accidentally killed the decedent, but later changed his statement when Presley told [Petitioner] no one would believe him. . . ." *Id.* Petitioner maintains that trial court's determination was unreasonable in light of the evidence presented in the state court proceeding. *Id.* Further, Petitioner represents that he was entitled to a lesser-included offense or involuntary manslaughter charge. *Id.* Respondent concedes that Petitioner challenged the trial court's denial of the jury charge, "but only as a violation of state law." ECF No. 26 at 23. In other words, Respondent argues that "[t]he claim of a violation of federal law regarding the denial of the charge was not raised in the state appeal and is defaulted." *Id.* at 24. To the extent Ground Two can be reviewed on the merits, Respondent argues that the "Supreme Court of South Carolina's reasoning is soundly based on fair interpretation of the facts of record." *Id.* at 26.

Concerning the trial court not charging the jury on defense of accident, the undersigned finds that Petitioner did not present a constitutional issue to South Carolina trial or appellate courts. In Petitioner's direct appeal, he argued that the trial court erred in not instructing the jury on accident based on the evidence presented during his trial. ECF No. 26-5. The same issue was raised in Petitioner's appeal to the South Carolina Supreme Court. ECF No. 26-8. Further, Petitioner's appellate briefs do not mention any of his constitutional rights were violated. Therefore this issue is procedurally barred because Petitioner did not raise any federal constitutional issue at the trial court or state court appellate level. *See Anderson v. Harless*, 459 U.S. at 6; *Pethtel v. Ballard*, 617 F.3d at 306; *Lopez v. Cartledge*, No. 4:13–2872–BHH, 2015 WL 5554562, at *17; *Johnson v. Mauney*, No. 1:11–1753–RMG–SVH, 2012 WL 2149763, at

*7; *Walker v. Warden of Broad River Corr. Inst.*, No. 1:09–2672, 2010 WL 3701331, at *8. To the extent the district court finds a federal or constitutional issue was raised, the undersigned finds no error.

Jury instructions must be viewed as a whole and there is error only if the petitioner proves a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380–81 (1990); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991). The Court explained that this standard was a "likelihood" of misinterpretation as opposed to a "slight possibility" of misinterpretation, and that a juror could have misinterpreted an instruction is different from the reasonable likelihood that the juror did misinterpret the instruction under the standard in *Boyde*. *See Weeks v. Angelone*, 528 U.S. 225, 236-37 (2000). The undersigned has reviewed the record and finds Presley's testimony cannot support a jury instruction on accident. In Presley's testimony, Petitioner was seeking Presley's advice as a jailhouse lawyer and posed a hypothetical question to him. App. 600-615. As the South Carolina appellate courts held, this testimony is not evidence which can form the basis of an accident charge under the facts of this case.

Therefore, Petitioner has not shown that the South Carolina appellate courts' decisions denying Petitioner's appeal was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Williams v. Taylor*, 529 U.S. 362, 399 (2000). Accordingly, the undersigned recommends that Ground Two be dismissed. *See Adams v. Aiken*, 41 F.3d 175, 182 (4th Cir.1994) (affirming the denial of habeas petition finding that there was not a reasonable

likelihood that the jury understood the instructions to allow conviction based on proof insufficient to establish guilt beyond a reasonable doubt).

> 3. Ground Three: IAC concerning (i) opening statements and (ii) failure to challenge jury instructions

In Ground Three Petitioner alleges that he received ineffective assistance of counsel during a "critical stage" of his jury trial. ECF No. 1 at 12. In particular, Petitioner maintains that trial counsel's opening remarks "made it clear to the jury that her client was guilty of the offense charged." *Id.* Additionally, Petitioner maintains that trial counsel failed to object to jury instructions from the trial court that were "ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Id.* The undersigned will address each specific alleged error in turn.

### i. Opening Statements

Concerning Petitioner's allegation that trial counsel's opening statements indicated that Petitioner was guilty of the offense as charged, Respondent represents that the State is interpreting this Ground as the one raised in Ground Four (b) of their Brief. This section only considers Petitioner's argument that trial counsel was ineffective in failing to object to certain jury instructions. Thus, it appears the State has not addressed this "opening statement" allegation. In his Response to the Summary Judgment Motion, Petitioner never addresses or mentions trial counsel's alleged error in her opening statement. ECF No. 42.

After review of proceedings in this matter, the undersigned finds that this particular ineffective-assistance-of-counsel claim is not available for habeas review because it was not properly exhausted in state court. Petitioner raised eight trial-counsel errors to the PCR court's attention but no error concerned trial counsel's opening statement. *See* App. 949; 1037-1057.

Further, an error in trial counsel's opening statement was never presented to the South Carolina Supreme Court in Petitioner's PCR appeal. *See* ECF Nos. 26-20; 26-23; 26-24. Therefore, because Ground Three (i) was never presented to the PCR court nor the South Carolina Supreme Court on PCR appeal, this Ground is not reviewable on the merits. *See, e.g. Pickard v. Connor*, 404 U.S. 270, 278 (1971) ("We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts."); *Baker v. Corcoran*, 220 F.3d 276, 288 (4th Cir. 2000) ("[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court."); *Williams v. Warden*, No. 4:08-2312-SB, 2009 WL 3052487, at *13 (D.S.C. Sept. 23, 2009) (finding that because petitioner "did not properly present this claim to the state's highest court in a procedurally viable manner when he had the opportunity, and the state courts would find any attempt to raise the claim now to be procedurally improper, then the claim is procedurally barred from review in federal habeas corpus"). Accordingly, the undersigned will not review Ground Three (i) on the merits.

### ii. Jury Instructions[7]

Concerning trial counsel's alleged error in failing to challenge jury instructions, Respondent argues that the PCR court's finding and conclusion was reasonable and in compliance with *Strickland*. ECF No. 26 at 31. Further, Respondent argues that "the record and the relevant law demonstrate there was not a viable objection to be made to the instruction in this case." *Id.* Petitioner does not respond to Respondent's arguments concerning Ground Three (ii) in his Response. *See* ECF No. 42.

Initially, the undersigned notes that the reviewable jury-instruction error is whether

---

[7] Based on the analysis here, the undersigned will not again address this issue when it comes up in Ground Four (2). *See* ECF No. 1 at 16.

"counsel failed to object to the Court's instruction to the jury that 'malice may also [a]rise where a deed is done with a deadly weapon,' where this instruction had a tendency to confuse the issues, mislead the jury, and inappropriately shifted the burden to the defense." *See* App. 1038-39. In its review of the charge, the PCR court determined that trial counsel was not ineffective in failing to object to the trial court's jury instruction concerning malice. App. 1046. There, the PCR court noted that Petitioner argued it confused the jury because during his criminal trial no evidence was presented "to support the use of a deadly weapon, whether gun or even pillow." *Id.* Additionally, the PCR court found that the South Carolina doctrine of implied malice does not improperly shift the burden to a defendant. *Id.* To the extent trial counsel should have objected to the malice instruction, the PCR court found that the jury instructions as a whole were accurate and it is "unlikely that this portion of the jury charge contributed to the verdict." App. 1047.

The undersigned finds the PCR transcript and trial transcript support the PCR court's finding. During the PCR hearing, PCR counsel argued that the trial court's jury instruction concerning malice misled and confused the jury. App. 1019. Jury instructions must be viewed as a whole and there is error only if the petitioner proves a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *Boyde v. California*, 494 U.S. at 380–81; *see also Estelle v. McGuire*, 502 U.S. at 72. The Court explained that this standard was a "likelihood" of misinterpretation as opposed to a "slight possibility" of misinterpretation, and that a juror could have misinterpreted an instruction is different from the reasonable likelihood that the juror did misinterpret the instruction under the standard in *Boyde*. *See Weeks v. Angelone*, 528 U.S. at 236.

In its charge on murder, which included defining malice, the trial court instructed:

The state must prove beyond a reasonable doubt that the Defendant killed another person with malice aforethought. Malice is hatred, ill-will or hostility towards

another person. It is the intentional doing of a wrongful act without just cause or excuse and with an intent to inflict an injury or under circumstances that the law would infer an evil intent.

Malice aforethought does not require that the malice exist for any particular time before the act is committed, but malice must exist in the mind of the Defendant just before and at the time that the act is committed. Therefore, there must be a combination of the previous evil intent and the act.

Malice aforethought may be expressed or inferred. Now, these terms expressed and inferred do not mean different kinds of malice, but merely the manner in which malice may be shown to exist; that is, either by direct evidence or by inference from the facts and circumstances which are proven.

Expressed malice is shown when a person speaks words which express hatred or ill -will for another or when the person prepared beforehand to do the act which was later accomplished.

For example, lying in wait for a person or any other acts of preparation going to show that the deed was within the Defendant's mind would be express malice.

Malice may be inferred from conduct showing a total disregard for human life, inferred malice may also rise where a deed is done with a deadly weapon.

A deadly weapon is any article, instrument or substance which is likely to cause death or great bodily harm, whether an instrument has been used as a deadly weapon depends on the facts and circumstances of each case.

So, again, the definition and what the State must prove beyond a reasonable doubt is that the Defendant killed another person with malice aforethought.

App. 904-906.

The undersigned finds the PCR court did not err in its application of *Strickland* by finding trial counsel did not err in failing to object to the trial court's above malice instruction. Further, after review of the record and the jury instructions in totality the undersigned agrees that in reading the charge as a whole, a juror would not have been misled nor reasonably believed that Petitioner had the burden of proof regarding his guilt. Moreover, the Supreme Court has upheld jury instructions containing permissive inferences. *Francis v. Franklin*, 471 U.S. 307, 314 (1985) ("A permissive inference does not relieve the State of its burden of persuasion because it

still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.").

Here, the trial court gave a correct jury instruction concerning malice, and because Petitioner was not entitled to a different jury charge a matter of state law, Petitioner cannot show that trial counsel was deficient in not requesting the charge. Therefore, Petitioner has not shown that the state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Williams v. Taylor*, 529 U.S. at 399. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment as to Ground Three (ii) and dismissing this habeas ground on its merits.

4. Ground Four: IAC concerning (i) failure to challenge the forensic pathologist's homicide finding and seek instruction by court on definition regarding homicide; (ii) failure to object to prior arrest evidence; and (iii) failure to effectively communicate with Petitioner about exculpatory evidence.

In Ground Four, Petitioner makes three ineffective-assistance-of-counsel arguments. ECF No. 1 at 15-16. The undersigned will address each alleged error in turn.

i. Forensic Pathologist's Homicide Finding

Petitioner argues that his trial counsel failed to sufficiently challenge the forensic pathologist's findings of homicide as a manner of death by failing to adequately cross examine the witness. ECF No. 1 at 15. Further, Petitioner argues trial counsel failed to seek an instruction from the trial court regarding the definition of "homicide." *Id.* Respondent argues no error occurred, and "the record shows a reasonable investigation informing a valid strategy." ECF No. 26 at 29. Respondent also argues that trial counsel "vigorously cross-examined the witness and

challenged the accuracy of the evidence." *Id.* Respondent maintains that the record shows a reasonable application of *Strickland* on these facts. *Id.* at 30.

As indicated in the analysis for Ground One, Dr. Nichols, a forensic pathologist, opined that the victim's death was a homicide. App. 529-581. Also indicated above, Petitioner's trial counsel lodged an objection to the "doctor's rendering an opinion as to the cause of death." App. 540. Further, trial counsel argued that Dr. Nichols was "rendering an opinion on the issue the jury has to decide." *Id.* Ultimately, the trial court overruled the objection with the stipulation from the State that it would have Dr. Nichols clarify what his definition of "homicide" was to the jury. App. 557-58. After providing his definition of "homicide," Dr. Nichols opined that the victim's cause of death was asphyxiation. App. 559.

On cross examination, trial counsel questioned Dr. Nichols about all theories he had ruled out, including manual and ligature strangulation, in making his cause-of-death determination. App. 562-571. The following line-of-questioning occurred on cross examination thereafter:

> Q:  So if you ruled out gunshot, knife wound, poisoning, blunt force trauma, you've ruled out those as methods that could have caused the death, correct?
> A:  That is correct.
> Q:  So you're left with the dead body, and you need to explain how this death came about?
> A:  Yes, sir.
> Q:  From your explanation -- and, you know, I may have this wrong.
> A: Uh-huh.
> Q: You arrived at your conclusions as to cause of death through a process of elimination and interpolation with the facts and circumstances surrounding the case?
> A: Yes.
> Q: By elimination you have eliminated all these other possible causes of death. And in your opinion, based on information provided to you by the representatives of the Coroner's Office, the death appeared to have occurred under suspicious circumstances, correct?
> A: Yes, sir.
> Q: Okay. So, since you don't have another explanation, the only explanation you're left with is suffocation, correct?
> A: Yes , sir.

. . . .

Q: Now, true or false: Sometimes people die and you just can't determine the cause of death?

A: True.

Q: Okay. They could just drop dead and you conduct an autopsy, it's not a stroke and it's not a heart attack, and it's nothing else, they just die sometimes, unfortunately, correct?

A: That is true.

Q: Other than the facts and circumstances surrounding this case, the information provided you by representatives of the coroner's Office that led you to believe in the case the death occurred in association with some very suspicious circumstances, okay?

A: Yes.

Q: Other than that, how can you rule out her just dying?

A: Well, that is the whole point of the autopsy is that everything gets interpreted by the history. By artificially separating the facts from an autopsy, you can make a homicidal gunshot wound, a suicidal gunshot wound or an accidental gunshot wound. Or maybe it wasn't a bullet that caused the hole after all.

But, once again, I do have those facts. I interpreted the autopsy, in regards to that fact, I believe Ms. Goodwin died of unnatural causes. And as a result of elimination and, like you mentioned, the interpolation of the facts of the case, that being her purse is gone, her car is gone, the house is locked up and somebody went through an awful lot of effort to cover up this death, that I feel that Ms. Goodwin died as a result of a homicide due to asphyxiation.

Q: That is what you feel?

A: That's my opinion here today, yes, sir.

Q: What -- and I understand and I'm with you completely as far as I think how you base your opinion and the effect of circumstances around the case lend to your arriving at that opinion. From a medical point of view, from the condition of the body itself, okay?

A: Yes, sir.

Q: What is there to support homicide as opposed to natural cause of death?

A: The lack of findings.

Q: The lack of findings?

A: Yes.

Q: Lack of any other reason to explain it?

A: That is correct. . . .

App. 571-75. Petitioner did not offer testimony of another forensic pathologist to challenge the

State expert witness's opinion during his criminal trial.

During his PCR hearing, Petitioner presented the testimony of Dr. Kimberly Ann Collins,

a forensic pathologist. App. 950-73. The State agreed that Dr. Collins was qualified to testify as an expert in forensic pathology. App. 952. Dr. Collins testified that she reviewed the post-mortem records and prepared an opinion letter that was offered into evidence. App. 953-54. Dr. Collins opined that "this is an undetermined cause of death." App. 957. Further, Dr. Collins opined that the victim's body and the fetus should have been x-rayed. *Id.* Moreover, Dr. Collins agreed that there was no medical basis to back up the opinion that "possible asphyxia" was the cause of death. *Id.* Dr. Collins offered several alternative/natural causes of death, such as "heart attack" and "pulmonary thromboembolus" or "eclampsia with seizure." App. 958.

During his PCR testimony, Petitioner testified that his initial trial lawyer, Jeanette VanGinhoven, consulted an expert in forensic pathology, Dr. Condrati. App. 977. Petitioner testified that his trial counsel told him that the potential expert was going to testify that asphyxiation was the victim's cause of death. App. 977. However, Petitioner testified he did not receive notes from that consultation. App. 978. Trial counsel Strickler testified that he, Ms. VanGinhoven, and Ms. Mosley (the second seat for Petitioner's case) met with Dr. Nichols on August 9, 2005. App. 989. During the meeting, Strickler was not the first seat on Petitioner's case. *Id.* Strickler testified that he knew Ms. VanGinhoven had communicated with Dr. Condrati, and they discussed Condrati's findings together. App. 990. Strickler testified that Ms. VanGinhoven gave him her notes from her communications with Dr. Condrati, and those notes were admitted as evidence at the PCR hearing. App. 990-91; 1070-73. It appears to the undersigned that Strickler relied on VanGonhoven's notes rather than his notes or personal knowledge in answering questions about Dr. Condrati's potential testimony. *See* App. 991-1011.

Concerning Dr. Condrati's consultation and findings, the following line-of-questioning occurred:

Q: In speaking Ms. VanGinhoven and reviewing the file preparing for the trial, were you aware that she had consulted Dr. Condrati?

A: Yes.

Q: Had you reviewed her notes and talked with her about it?

A: I'm sure I discussed with Ms. VanGinhoven her findings, and she gave me access to it, definitely.

Q: What was your understanding of what Dr. Condrati' s opinion would be?

A: If I had the notes, I'd consult them. I'll tell you what my understanding was. I briefly looked at the copies that you had earlier today, can't find those myself in those three boxes. They're obviously there since that's where you got your copies from, but I can't find them.

Q: All right. I'll go ahead and enter this.

Beg the Court's indulgence. Mark this, make complete, for the record.

(WHEREUPON, Applicant's Exhibit No. 4 was marked for identification only.)

BY MS. GOLDBERG:

Q: Mr. Strickler, I'm going to hand you Applicant's number 4. Can you just look over that document and tell me what that is or what it appears to be?

A: These appear to be some of the notes kept by Ms. VanGinhoven in relation to this trial, this case.

Q: And to be fair, you weren't available to locate them yourself in your file. There may be more. You wouldn't know.

A: I know there are more. I don't think there are--well, if there are any more regarding Ms. Condrati, I couldn't find these. She definitely had more notes on other aspects of the case –

Q Right.

A — which I did find.

Q That's fair. Do you have an understanding of what Dr. Condrati 's opinion would have been?

A Well, about six lines down, it says the cause of death would have been undetermined or homicide. Then immediately thereafter it says, "Nichols would have all police report. He doesn't work in a vacuum. Autopsy alone, undetermined cause of death." Then she says "she going to testify against him [sic]." I don't know what that means which is consistent with what I remember.

. . .

A:  . . . .I believe his testimony was that he [Dr. Nichols] relied on those [investigative reports] at least in part in making a determination that the case was a homicide as opposed to suicide, accident or undetermined which was consistent with — appears to me to be consistent with Dr. Condrati had said to Ms. VanGinhoven.

Q: Did you ever — or do you remember if you ever specifically talked to Dr. Condrati yourself?

A: No, I don't.

Q: You don't remember or you didn't?

A: I don't remember. I don't think I did, but I don't remember.

Q: Since she had been retained as a consultant, did you ever consider asking her

to be present during trial to assist in cross-examination?

A: No.

Q: Did you think that her — that she would offer testimony at trial that would be harmful to his case?

A: "Autopsy alone, undetermined cause, she going to testify against him [sic]".

Q: Okay.

A: I believe that —

Q: You believe?

A: I believe that means exactly what Mr. Commander testified to earlier today; that she would testify that it wasn't undetermined. It was a homicide. She even used the term asphyxia to him which is precisely what Dr. Nichols, I believe, testified to as the cause of death.

. . .

Q: Did you or Ms. VanGinhoven, to your knowledge, go through alternate causes of death with Dr. Condrati?

A: I didn't.

Q: Did —

A: Ms. VanGinhoven may.

. . .

Q: Okay. In regards to Dr. Condrati's notes and our testimony about the forensic pathologist, when we're looking at the manners of death, essentially the options for this situation were homicide or undetermined; is that right?

A: That was what Dr. Condrati said, and I agree with that, yes.

App. 990-1000.

Concerning this PCR evidence, the PCR court specifically found:

Counsel testified that he understood *from the notes* that Dr. Conradi would have testified that based on the autopsy alone, the cause of death would be undetermined, but would also have made the finding of homicide with the additional information, which was consistent with Dr. Nichols' findings. Counsel testified that he did not call Dr. Conradi as a witness because he believed she would testify against [Petitioner].

App. 1043 (emphasis added). Based on this factual determination, the PCR court determined that trial counsel Strickler was not ineffective for failing to call an expert to testify as to victim's cause of death. *Id.* Further, the PCR court held that an expert was consulted, and "the strategic decision was made not to call her because of the risk of her supporting the State expert's findings." *Id.* Acknowledging there is a duty for trial counsel to complete a "reasonable

investigation," the PCR held as a matter of law that trial counsel Strickler met this standard in contacting Condrati and "forwarding her almost the same materials that were reviewed in preparation by Dr. Collins for this hearing." *Id.* Finally, the PCR court found that trial lawyers are not "required to seek an expert until one is found that will provide the testimony that helps the defense." *Id.*

Based on a thorough review of the trial and PCR court records, the undersigned is of the opinion that the PCR court erred in its reliance on Strickler's testimony and other notes in reaching its conclusion that trial counsel Strickler was not ineffective in failing to call an expert witness on Petitioner's behalf. It appears that trial counsel Strickler did not directly communicate with Dr. Condrati or have a clear understanding of Dr. Condrati's opinion concerning victim's cause of death. Further, during his PCR testimony Strickler reads directly from Ms. VanGinhoven's consultative notes rather than his own in answering direct questions posed to him. To further demonstrate his confusion as to the possible conclusion of Dr. Condrati's opinion, Strickler testifies that she would have testified victim's cause of death was a homicide *or* undetermined. App. 991. Moreover, though the undersigned agrees that while trial lawyers are obligated to conduct a reasonable investigation, it does not appear *Strickler* ever made direct contact with Dr. Condrati. Without direct contact with Dr. Condrati or a clear understanding of Condrati's expert conclusions, Strickler would have been unable to formulate a strategic decision concerning whether it would benefit Petitioner to call Dr. Condrati as an expert witness. The court is tasked with determining whether trial counsel was ineffective in failing to consult with and ultimately call an expert forensic pathologist as a witness. On that precise issue, the undersigned finds possible error. Therefore, the undersigned finds that Petitioner met his initial burden under *Strickland* by because he demonstrated that Strickler did not meet the objective

standard of a reasonable investigation under prevailing professional norms concerning his efforts to obtain an expert witness.

Concerning trial counsel's other alleged errors with regard to Dr. Nichols—(1) failing to adequately cross examine the witness; and (2) failing to seek an instruction from the trial court regarding the definition of "homicide"—the undersigned finds no errors occurred. The trial court record demonstrates that Dr. Nichols provided his own definition of "homicide" and further demonstrates that trial counsel Strickler sufficiently objected to Dr. Nichols' testimony. App. 529-81. Moreover, the undersigned finds Strickler thoroughly cross-examined Dr. Nichols. *See id.* Therefore, on these two particular allegations of ineffective assistance of counsel, the undersigned find Petitioner failed to meet his initial burden under *Strickland*.

Turning to the second *Strickland* prong, despite finding trial counsel Strickler erred in his efforts to refute the State's expert witness, the undersigned finds Petitioner was not prejudiced by any possible error. Overwhelming evidence, including damaging testimony in the record, demonstrates Petitioner's guilt. First, State's witness John Presley, a self-proclaimed jailhouse lawyer, testified that Petitioner admitted killing the victim. App. 603-04. Specifically, Presley testified that Petitioner said he fell on victim and suffocated her after victim hit him with a stick during an argument. *Id.* Further, Presley testified "[Petitioner] said that he wrapped her body in sheets and placed her body on the sofa somewhere in the house. He placed her body on the sofa and left her there. And he said he took her credit cards and her car. And he went to various states. . . . App. 604. Presley repeatedly testified that Petitioner told him victim died from suffocation. App. 603-606; 629. Additionally, three law enforcement officers testified they heard Petitioner say: "I'm going to kill myself, just like I killed Vonnie." App. 656; 678; 699-707; 721. A different officer testified that Petitioner told him and his partner: "I just did what I had to

do," while they were transporting Petitioner once he was apprehended. App. 754-55. Moreover, evidence demonstrates Petitioner travelled through several states with victim's car and other personal possessions. App. 669-72; 702-03. Therefore, the undersigned finds the State presented overwhelming evidence of Petitioner's guilt based on Petitioner's own incriminating statements coupled with the circumstances of his arrest. In other words, the undersigned finds that there is not a reasonable probability that, but for counsel's error, the result of Petitioner's criminal trial would have been different.

Therefore, the undersigned finds, on the issue of prejudice, that Petitioner has not shown that the state courts' decisions were contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See Williams v. Taylor*, 529 U.S. at 399. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment as to Ground Four (i) and dismissing this habeas ground on its merit.

## ii.   IAC:  failure to object to prior arrest evidence

In Ground Four (ii), Petitioner argues that trial counsel failed to object to evidence concerning his prior arrest for domestic violence against victim. ECF No. 1 at 16. Further, Petitioner argues this evidence was emphasized during the State's closing argument. *Id.* Respondent argues that the PCR court correctly determined that trial counsel was deficient in failing to object to the witness's testimony and in finding that Petitioner was not prejudiced by his deficiency based on the "factual basis for the conviction [which was] 'overwhelming.'" ECF No. 26 at 32. Respondent points to certain evidence in the trial court record that demonstrates "overwhelming evidence" of Petitioner's guilt. *Id.* at 33.

During Petitioner's criminal trial, Presley testified without objection that Petitioner told him he would fight with victim and that "at one time when he hit her, that he was arrested for domestic violence, and that she later dropped the charges and they discharged him, they released him." App. 608. During PCR, trial counsel testified he recalled witness Presley's testimony that Petitioner had previously been arrested for domestic violence against the victim. App. 997. Trial counsel agreed that he should have objected to the testimony but did not. *Id.* During cross-examination at PCR, Strickler agreed that it was possible he did not object or attack Presley's testimony about Petitioner's alleged domestic violence so as not to emphasize the bad act to the jury. App. 1008-09. Strickler testified he tried to demonstrate to the jury that Presley "was a jailhouse snitch, and he was snitching on everyone he possibly could. . ." App. 1009. Further, Strickler testified he conducted an in-depth cross-examination of Presley in order to demonstrate Presley's motives, his desire to get a reduced sentence, and Presley's prior truthfulness convictions. *Id.*

The PCR court found trial counsel was deficient in failing to object to Presley's testimony because prior bad acts that are not the subject of a conviction are inadmissible. App. 1048. However, the PCR court determined that Petitioner failed to meet his burden of proving he suffered prejudice as a result of the deficiency. App. 1049. On this issue, the undersigned finds that Petitioner has failed to demonstrate that the PCR court erred in finding his trial counsel was effective under *Strickland*. Furthermore, the undersigned does not find that the PCR court's legal analysis under *Strickland* was objectively unreasonable. The undersigned finds that this court is prohibited from granting habeas relief unless the state court's decision contradicts, or is an unreasonable application of, "clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The PCR court's determinations concerning

trial counsel's effectiveness during the presentation of lay-witness Presley does not contradict and are not an unreasonable application of federal law as determined by the Supreme Court of the United States. Therefore, this court cannot conclude that the PCR court's determination on these issues was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment because Petitioner failed to demonstrate the second prong of the *Strickland* test concerning habeas Ground Four (ii).

    iii. IAC:    failure to effectively communicate with
         Petitioner about exculpatory evidence.

Petitioner argues that trial counsel failed to effectively communicate with him when making the decision not to present exculpatory DNA evidence at trial. ECF No. 1 at 16. Further, Petitioner maintains that trial counsel failed to object to an improper statement by the Solicitor. *Id.* Finally, Petitioner contends trial counsel failed to move for a mistrial when the Solicitor improperly commented during her closing argument that there was no DNA physical evidence found at the crime scene because Petitioner used gloves. *Id.* Respondent argues "the record shows a reasonable application of *Strickland* on these facts." ECF No. 26 at 34-35.

During his PCR hearing, Petitioner represented that during the investigation of his case he gave a DNA sample for a test. App. 978-79. Specifically, a pair of gloves was found at the crime scene, inside the house. App. 980. Petitioner testified that his first trial attorney indicated to him that results of the DNA testing were "exculpatory." App. 979. Based on the results of the DNA test, Petitioner testified that Ms. VanGinhoven moved for a continuance, which the trial court granted. *Id.* Petitioner testified he received a copy of the DNA results after his trial was complete. App. 979-80. Petitioner testified he discussed the DNA evidence with trial counsel Strickler, and "[h]e was supposed to present it at trial." App. 980. Petitioner represented that

someone else's DNA was found on the gloves. *Id.* However, trial counsel never presented the DNA results on the gloves into evidence during Petitioner's trial. App. 981. Petitioner testified that he believed his trial counsel did not introduce it because he wanted the final closing argument. *Id.*

During trial counsel's testimony at the PCR hearing, Petitioner's PCR counsel introduced the DNA report into evidence. App. 998. Trial counsel Strickler agreed that he recognized the DNA report as a discovery item that was disclosed to the defense according to Ms. VanGinhoven's notes. App. 998-99. Trial counsel indicated that the following were the results of the DNA testing:

> DNA testing was on right hand nail scrapings and left hand nail scrapings which were consistent from the same female individual and then from swabs from rubber gloves which were found to be a mixture.
> The female profile developed in item one and two is included as a contributor in this case, which you are. The other contributor is a male. [Petitioner] is excluded as contributor to the mixture.

App. 999. During his direct examination, trial counsel agreed that he never offered the DNA analysis into evidence even though the jury knew that DNA was taken from the scene. ECF No. 50-1 at 3. Concerning why he chose not to introduce the evidence, trial counsel testified "[a]s I sit here right now, presence or absence of someone's DNA, gloves from a trash can is absolutely irrelevant to this case." *Id.* at 4. Trial counsel acknowledged that the State made an issue out of the DNA during its closing argument. *Id.* In fact, trial counsel agrees that "Solicitor Meadors infers the reason there is no DNA at the scene is because [Petitioner] was cleaning things." *Id.* at 5. Trial counsel also agreed that he did not object to the Solicitor's "improper" comments. *Id.* He agreed that he should have objected but "[d]ropped the ball." *Id.*

On the issue of trial counsel's failure to introduce the DNA analysis into evidence, the PCR court found trial counsel was not ineffective because his strategy of preserving last

argument was a valid strategic decision, especially in the light of the fact that he could argue that the State failed to present any evidence that Petitioner was a match to any DNA tested. App. 1051. Concerning trial counsel's failure to object to the State's closing argument, the PCR court found that "the Solicitor's closing argument was supported by reasonable inferences from the testimony and evidence presented at trial." App. 1052. Additionally, the PCR court found that trial counsel was not deficient in failing to request a mistrial. *Id.* Concerning the prejudice prong of the *Strickland* test, the PCR court again referenced the overwhelming circumstantial evidence against Petitioner. *Id.*

The undersigned agrees with the PCR court's finding that trial counsel did not err in failing to introduce the DNA analysis. During the trial, one of the crime scene investigators testified that "a pair of clear rubber gloves" was found at the crime scene. App. 349. Officers found the gloves at the bottom of a trash can inside victim's home. App. 350. The investigator confirmed that he took the gloves back to headquarters. *Id.* After reviewing the criminal trial transcript, it does not appear to the undersigned that the State presented any evidence of Petitioner's DNA being at the crime scene. Therefore, there would have no need to further demonstrate or rebut a lack of Petitioner's DNA at the crime scene.

Concerning whether trial counsel erred in failing to effectively communicate with Petitioner regarding the DNA evidence or failing to introduce the DNA analysis, the undersigned finds Petitioner has failed to demonstrate either *Strickland* prong. First, as trial counsel indicated, the lack of DNA on gloves in the trash can would likely not have impacted the case especially given counsel's desire to retain the last argument. Petitioner testified at the PCR hearing that he was aware of this reasoning. App. 981. Therefore, the undersigned finds that it was a matter of trial strategy not to introduce the DNA analysis. *See e.g.*, *Lovitt v. True,* 403 F.3d 171, 181 (4th

Cir. 2005) (where the Fourth Circuit Court of Appeals refused to misuse "power of hindsight" to second guess trial counsel's "plausible strategic judgments."); *Fitzgerald v. Thompson,* 943 F.2d 463, 469 (4th Cir. 1991) ("[T]rial counsel made reasonable tactical decisions that should not now be second-guessed on collateral review."). Accordingly, the undersigned recommends finding that trial counsel did not err in communicating with Petitioner or in failing to introduce the DNA analysis into evidence under the first *Strickland* prong.

However, the undersigned finds possible error when trial counsel did not attempt to combat a statement made during the State's closing argument. In its closing argument, the State explained the following to the jury:

> [A] lot of time you don't find fingerprints even in your house. I know why we didn't find anything here. He's cleaning up. He's cleaning up.
> Dr. Nichols said only one time in my 25 years have we found something underneath fingernails. He's cleaning up. There are gloves in there. If he tries to make any issue about why anything wasn't else there, DNA his client, may try to get, they're cleaning, he cleaned it up.

App. 849. Trial counsel lodged no objection to this part of the State's closing argument. *Id.*

After review of the trial transcript, the undersigned agrees with the PCR court that one could reasonably infer that the perpetrator made efforts to clean the crime scene. However, based on the DNA analysis, the undersigned finds that it would *not* be reasonable to infer that Petitioner used the gloves found at the crime scene to clean up evidence. On this precise issue, the undersigned finds Petitioner met his burden of proving trial-counsel error because he presented the exonerating DNA evidence during his PCR hearing. Therefore, the undersigned is of the opinion that the PCR court erred in its finding that the State's closing argument—that included reference to the gloves found at the crime scene—was supported by reasonable inferences from the testimony and evidence presented at trial. Based on this finding, the

undersigned also disagrees with the PCR court's finding that trial counsel was not deficient in failing to object or request a mistrial during this section of the State's closing argument.

However, the undersigned finds Petitioner has failed to demonstrate the second *Strickland* prong concerning the State's closing argument. As already mentioned in above sections, overwhelming evidence, including Petitioner's own self-incriminating statements coupled with the circumstances of his arrest demonstrates Petitioner's guilt. Because the undersigned finds the State presented overwhelming evidence of Petitioner's guilt, the undersigned finds that there is not a reasonable probability that, but for counsel's error, the result of Petitioner's criminal trial would have been different. Therefore, the undersigned finds that the PCR court's dismissal of Petitioner's claim of ineffective assistance of counsel was not an unreasonable application of federal law. Accordingly, the undersigned finds that Petitioner has failed to demonstrate that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d) & (e)(1). As a result, the undersigned finds that Ground Four (iii) should be dismissed.

### 5. Ground Five: Actual Innocence

In Ground Five, Petitioner maintains that he is actually innocent of the crime. ECF No. 1 at 19. Specifically, Petitioner argues that "[f]inding out about the exculpatory evidence after trial has become newly discovered evidence that could have changed the outcome of [his] trial proceedings." *Id.* Respondent argues Petitioner's fifth habeas ground is not cognizable. ECF No. 26 at 35. Even if Petitioner's claim could be reviewed, Respondent maintains Petitioner has not met his "extraordinarily high" burden. *Id.* at 36-37.

The undersigned finds that "actual innocence" is not an independent habeas claim. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Rather, actual innocence is "a gateway through

which a habeas corpus petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* An allegation of actual innocence must be coupled with an allegation of a constitutional violation, *see* 28 U.S.C. § 2254, and must be supported "with new reliable evidence," that "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 324, 327 (1995). Moreover, Petitioner has not presented any new, additional evidence to support his claims of "actual innocence" that was not available to him at the time of his trial. *See Clagett v. Angelone*, 209 F.3d 370, 379 (4th Cir. 2000) (citing *Coleman*, 501 U.S. at 750); *see also Weeks v. Angelone*, 176 F.3d 249, 269. Petitioner admitted during his PCR hearing that the DNA analysis was available during his trial, but trial counsel opted not to use it. App. 979-81. Further, the evidence does not exonerate Petitioner. Rather, it only demonstrates that his DNA is not present on one piece of evidence at the crime scene. Under these circumstances, he fails to show that his convictions should be vacated as being manifestly unjust. *Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999). Accordingly, the undersigned recommends that Respondent's Motion for Summary Judgment be granted as to Ground Five.

V. Conclusion and Recommendation

Therefore, based upon the foregoing, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 27, be GRANTED and the Petition be DENIED. Based on this recommendation, the undersigned recommends denying Petitioner's Motion to Compel Discovery. ECF No. 43. Petitioner is advised that absent good cause shown, there is no discovery or investigation in § 2254 habeas actions. Based on the above analysis, the undersigned finds Petitioner has failed to demonstrate cause necessary to engage in discovery. Therefore, Petitioner's request for discovery or investigation is denied pursuant to Rule 6(a) and (b) of the Rules Governing § 2254 Cases, 28 U.S.C.A. foll. § 2254; *see also Harris v. Nelson*, 394 U.S. 286 (1969).

IT IS SO RECOMMENDED.

December 14, 2017                                    Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge


**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**